437 P.2d 886

William Parley SPRATLING and Daisy Spratling, Plaintiffs and Respondents,

v.

STATE of Utah, By and Through its LAND BOARD, Defendant and Appellant.

No. 10947.

Supreme Court of Utah.

Feb. 21, 1968.

Phil L. Hansen, Atty. Gen., LeRoy Axland, Asst. Atty. Gen., Salt Lake City, for appellant.

Frank J. Allen, Salt Lake City, for respondents.

HENRIOD, Justice:

Appeal from a judgment that the Spratlings were entitled to the mineral rights which they presumably acquired by virtue of an agreement to purchase, executed between the Land Board and Spratlings' predecessors in interest, in 1907. Affirmed.

In February, 1907, such predecessors subscribed to the terms of a contract

under then existing selection laws,[1] which contemplated the fruition of title when and if the State acquired the described selected land, then owned by the federal government, in lieu of State-owned lands. In August, 1907, the Land Board accepted and firmed the terms of the agreement. No mention was made as to reservation of mineral rights to the State. Shortly thereafter, on November 1, 1907, the selection was approved by the U. S. Land Office. On May 12, 1919, an act passed by the legislature[2] became effective, wherein it was provided that "all coal and other mineral deposits in lands belonging to the State are *hereby* reserved to the State"[3] and that "all applications to purchase *approved subsequent to the passage of this Act* shall be subject to a reservation to the State of all coal and other mineral deposits * * *."[4] On October 19, 1919, about four months after the effective date of the act, the U. S. Department of Interior approved the selection as being of nonmineral character. The approval could not have been given had it been determined otherwise. On July 26, 1920, 14 months after the effective date of the act, the subject land was patented to Spratlings' predecessors with no reservation of mineral rights whatsoever,—which seems to be some sort of mute evidence that the Land Board had no misgiving about the intentions of the parties in 1907, nigh onto a half century prior to the time the present Land Board urges the parties did not intend to accomplish exactly what eventuated here. It is rather fundamental that the onus of one assailing the so-called "intentions" of parties to an ancient document is on the assailant who must prove by clear and substantial evidence that their intentions were otherwise. It seems to us that this burden has not been borne, and that in fact it was negated by the contender, that has subscribed to the execution of and became particeps to a fait accompli which it now seeks to emasculate by urgence, not fact. In saying this, there seems to be no escape from the conclusion that the trial court must be affirmed on the question of intention. Irrespective of the fact that mineral thereafter might have been suspicioned to exist or even found to lie within the described property, all procedural and administrative matters had been perfected, the applicants for purchase had paid their initial down payment, nothing was left to do save payment of the balance of the consideration in exchange for a patent, and the patent was issued. Thereafter it would seem to be a unilateral renegation of what the parties bilaterally actually did, which

---

1. Laws of Utah 1899, Chap. 64, Sec. 16. (There was no provision for reservation of mineral rights at the time, as there is in Laws of Utah 1919, Chap. 107, §§ 5575x and 5575x1, now Title 65-1-14 et seq., U.C.A.1953, Repl. Vol.)

2. See footnote 1.

3. See footnote 1. (Laws of Utah 1919, Chap. 107, Sec. 5575x.)

4. See footnote 1. (Laws of Utah 1919, Chap. 107, Sec. 5575x1.)

would seem to be somewhat too late. Also this would seem to dispose of the present contention that the 1907 principals did not intend to do what the patent obviously confirmed was intended. The only basis for appellant's contention is a clause in the 1907 agreement that the applicant "will purchase * * * in accordance with the provisions of the law governing land sales." We think a reasonable interpretation of that language better would be employed to say the parties had in mind the law governing land sales extant in 1907,—a construction more in consonance with reason than one anticipating some other construction indulged 60 years later based on a statute passed in 1919, which the Land Board now wishes to construe otherwise, after having recognized its own signature on a 1920 contract for some 45 years.

■■ The only other point on appeal is that irrespective of what the Land Board did, it was wrong, ultra vires and offensive to the statute it says it violated itself, and that now it can cure the misery it contracted with an elixir labeled "police power." All we can say is that such a tonic is difficult to assimilate. There was some talk in the brief that by virtue of such error the school fund will suffer,—which understandably may be emotional, but not too legal. The answer to the ultra vires contention can be twofold: 1) That in 1907, the selectors had an inchoate interest in the fee of the land, subject only to a condition subsequent. This, just as a conditional sales buyer has such interest, if he makes the payments and at time of conveyance there is a marketable title, and 2) which may be more important, that the 1919 legislature clearly made the act operative, not ex post facto, but in futuro, as has been pointed out above. We believe that the State should honor contracts it is authorized to make, like everyone else,—governmental immunity lacking, which was not pressed as an issue here,—and which may have been ridiculous issue under the facts of this case. We are not saying that the police power could not be a factor in many types of cases,—but not here—and it would seem that the police power is not radically different now than it was in 1920, 45 years ago. We think the police power should be exercised with caution and not too hastily invoked in any fashion that would destroy the fundamental principle that the obligation of contract should not be swept under the rug too lightly.

We see no error in the trial court's decision, and we have some sort of small conviction that his decision ultimately could inure to the benefit of public weal and revenue-gathering. The latter, perhaps, in taxes or some other source, or mayhap for the benefit of the school fund or some other equally meritorious fund.

CROCKETT, C. J., and CALLISTER, TUCKETT and ELLETT, JJ., concur.